**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **Y.C.Q.**, a minor, individually, by and through Educational Decision Maker Renee Platz, and **Renee Platz**, individually,<br><br>    Plaintiffs,<br><br>    v.<br><br>**Chichester School District,**<br><br>    Defendant. | Case No. 25-cv-03574 |

**<u>COMPLAINT</u>**

## I.    <u>INTRODUCTION</u>

1.      Y.C.Q. is a child with a disability who is also an immigrant, an English learner, and a child in foster care who has experienced great difficulties in school for years. Y.C.Q. is now 17 and entering 12th grade in the fall.

2.      Through a pattern of deliberate inaction, delay, and denial, and in the face of two due process rulings finding Y.C.Q. eligible for special education services and finding that she is being denied a free appropriate public education ("FAPE"), Chichester School District ("District") has deprived Y.C.Q. of *any* special education services that will allow her to learn the basic foundational academic skills that she needs to achieve her post-secondary goals of employment and independent living. Despite consistent strong advocacy from Y.C.Q.'s court-appointed Educational Decision Maker ("EDM"), Renee Platz, the District has deliberately and knowingly forced Y.C.Q. to languish in an academic program that will not meet her special education needs and compounds her anxiety and depression stemming from her history of trauma.

1

3.     In addition, the District has failed to meet Y.C.Q.'s significant language instruction needs.

4.     This action is brought under the Individuals with Disabilities Education Act ("IDEA"), Section 504 of the Rehabilitation Act of 1973 ("Section 504"), the Equal Education Opportunity Act ("EEOA"), and Title VI of the Civil Rights Act of 1964 ("Title VI") for the District's violation of Y.C.Q.'s right to a FAPE, denial of Y.C.Q.'s equal access to the District's programs and services, on the basis of disability, race, and/or national origin, the failure to provide effective language instruction, and its discrimination of Y.C.Q. on the basis of disability, race, and/or national origin.

5.     Court-appointed EDM, Renee Platz, files this complaint on behalf of Y.C.Q., a minor, seeking judicial review of a Decision of a Special Education Hearing Officer ("Decision"), issued April 14, 2025, determining that the District denied Y.C.Q. a FAPE, but failing to adequately address the alleged Section 504 violations, failing to properly consider whether procedural violations denied Y.C.Q. a FAPE, and incorrectly determining that Y.C.Q. was not eligible under the disability category of specific learning disability in math calculation, and failing to provide an adequate remedy in the form of compensatory education services for the District's acknowledged violations of Y.C.Q.'s rights. The Decision is attached as Exhibit A.

6.     The Decision was issued following an administrative special education due process hearing conducted by the Office of Dispute Resolution ("ODR").[1]

---

[1] The ODR, which administers the special education due process hearing system in Pennsylvania, is a governmental unit through which Special Education Hearing Officers preside over administrative hearings and issue related determinations. As a governmental unit, the ODR and the Special Education Hearing Officer in the underlying matter are disinterested in this complaint.

II.     **PARTIES**

7.      Y.C.Q. is a 17-year-old individual with a disability who is diagnosed with Unspecified Depressive Disorder, Unspecified Stressor and Trauma Related Disorder, Emotional Disturbance, and a Specific Learning Disability in math calculation. Y.C.Q. resides in Chichester, Pennsylvania, where she was placed by the Department of Human Services ("DHS") of Philadelphia after an adjudication of dependency by the Family Court of Philadelphia County. Y.C.Q. does not speak fluent English and communicates in Spanish.

8.      Renee Platz of CASA of Philadelphia County ("CASA") is the court-appointed EDM of Y.C.Q.  The Family Court of Philadelphia County, which has jurisdiction over Y.C.Q.'s legal custody, appointed an individual from CASA as the EDM in accordance with 237 Pa. Code Rule 1147. When a court appoints an EDM, that party is responsible for all education decisions for the child. Among other duties, the EDM has the obligation to "take appropriate actions to ensure that…the child is receiving appropriate education that will allow the child to meet state standards, including any necessary services concerning special education in the least restrictive environment." 237 Pa. Code Rule 1147. The appointment acts as a temporary designation of educational rights *solely* to the EDM who serves as the IDEA Surrogate Parent pursuant to 34 CFR 300.519(c) (authorizing surrogate parent to be appointed by the judge overseeing the child's case).

9.      The EDM was a party to the underlying administrative proceeding before the ODR, docketed at ODR No. 29972-24-25 KE.

10.     Chichester School District is a school district within the Commonwealth of Pennsylvania organized pursuant to the Public School Code of 1949, Act of March 10, 1949, P.L. 30, as amended, 24 P.S. 1-101 et seq. The District is located in Southeastern Pennsylvania at

3

401 Cherry Tree Road, Aston, Pennsylvania, 19104. The District receives federal funds pursuant

to the IDEA and is bound by the IDEA. The District is a Local Educational Agency ("LEA")

responsible for ensuring that Y.C.Q. receives a FAPE under the IDEA and Section 504.

11.    Y.C.Q. resides within the District.

12.    The District was a party to the underlying administrative proceeding, during

which it was represented by counsel.

13.    As a recipient of federal funding, the District is required to comply with Section

504 of the Rehabilitation Act, 29 U.S.C. § 794, and Title VI of the Civil Rights Act of 1964, 42

U.S.C. § 2000d.

14.    As a local educational agency, the District is required to comply with the Equal

Education Opportunities Act ("EEOA"), 20 U.S.C. § 1703(f), and Individuals with Disabilities

Education Act ("IDEA"), 20 U.S.C. § § 1400 et seq.

## III.    JURISDICTION AND VENUE

15.    The claims in this action arise under federal law, specifically the IDEA, 20 U.S.C.

§ § 1400 et seq., and 34 C.F.R. § 300 et seq.; Section 504, 29 U.S.C. § 794; the Equal Education

Opportunities Act, 20 U.S.C. § 1703(f); and Title VI of the Civil Rights Act of 1964, 42 U.S.C. §

2000d. This Court has subject matter jurisdiction under 28 U.S.C. § 1331, 29 U.S.C. § 794, and

20 § U.S.C. 1415(i)(2).

16.    The claims for injunctive relief are authorized by 28 U.S.C. § 2201.

17.    Venue is proper in the Eastern District of Pennsylvania under 28 U.S.C. §

1391(b).

18.    Plaintiffs Y.C.Q. and Renee Platz have exhausted administrative remedies to the

extent required by the IDEA, 20 U.S.C. § § 1415(i)(2) and 1415(i)(3)(A). After a six-day due

process hearing, the hearing officer issued a due process hearing decision on April 14, 2025.

19.     In the underlying administrative proceeding, Plaintiffs asserted claims under the IDEA and claims under Section 504, specifically alleging that the District denied Y.C.Q. a FAPE and discriminated against her by: (1) failing to locate, identify, and evaluate her to determine eligibility for special education, related services, and a Section 504 plan; (2) failing to timely respond to the IDEA parent's request for an evaluation; (3) failing to timely and appropriately evaluate her in all areas of need; (4) failing to appropriately determine her eligibility for special education, related services, and a 504 plan and (5) failing to provide special education services thereby depriving her a FAPE.

20.     The IDEA permits "any party aggrieved by" a hearing officer's findings or decisions to bring a civil action in state or federal court. 34 CFR § 300.516 (a).

21.     A court then "receives the records of the administrative proceedings;" "hears additional evidence at the request of a party;" and "grants the relief that the court determines appropriate." 34 C.F.R. § 300.516(c).

22.     A court must independently determine whether a school district complied with the procedural requirements of the IDEA and provided the student with a FAPE. *Bd. of Educ. Of the Hendrick Hudson Cent. Sch. Dist. v. Rowley,* 458 U.S. 176, 205 (1982).

## IV.    <u>STATUTORY FRAMEWORK</u>

<u>IDEA Statutory Framework</u>

23.     The IDEA requires LEAs and other public agencies to provide a FAPE to all students with disabilities ages 3 to 21. A FAPE requires adherence to state agency educational standards and requires that LEAs prepare students with disabilities for further education, employment, and independent living based on Individualized Education Programs ("IEPs")

developed with meaningful participation of the parent, the student, school staff, and key LEA staff. *See* 20 U.S.C. § § 1401, 1402, 1412(a)(1)(A), 1414(d), 1415; 34 C.F.R. 300 et seq. The IEP is the "primary vehicle" for providing a FAPE and implementing the IDEA.

24.    The IDEA requires LEAs to have in effect policies and procedures to ensure that all children with disabilities are "identified, located and evaluated" in accordance with its procedures. 34 C.F.R. § 300.111(a)(1). This must include "children who are suspected of being a child with a disability…even though they are advancing from grade to grade" and "highly mobile children, including migrant children." 34 C.F.R. § 300.111(c).

25.    A child qualifies as a "child with a disability" based on a two-step process: first, does the child meet one of the IDEA's disabilities categories defined in 34 C.F.R. § 300.8(c); and, second, does the child require special education and related services due to that disability. 34 C.F.R. § 300.8(a)(1).

26.    The IDEA requires that educational decisions about a child's evaluation, educational program, and school placement are made through the IEP team process with the parent's meaningful participation. 20 U.S.C. § 1414.

27.    The IDEA defines a "parent" to include a person "authorized to make educational decisions for the child." 34 C.F.R. § 300.30(a). Under Pennsylvania law, a court can appoint an EDM for a child in foster care to "take appropriate actions to ensure that…the child is receiving appropriate education that will allow the child to meet state standards, including any necessary services concerning special education in the least restrictive environment." 237 Pa. Code Rule 1147. Children who are in foster care are considered "highly mobile" under the IDEA. *See Letter to State Dirs. of Special Educ.*, U.S. Dept. of Educ. (Nov. 10, 2022), at https://sites.ed.gov/idea/files/Letter-to-State-Directors-of-Special-Education-on-Ensuring-a-

High-Quality-Education-for-Highly-Mobile-Children-11-10-2022.pdf.

28.     Under IDEA, all children who are suspected of having a disability and who need special education and related services, including highly mobile children, must be evaluated in a timely manner and without undue delay. 34 C.F.R.§§ 300.101, 300.111, and 300.131. Federal guidance instructs that highly mobile children should have expedited evaluations and eligibility determinations and strongly encourages districts to complete evaluations within 30 days. *See Letter to State Dirs. of Special Educ.*, U.S. Dept. of Educ. (Nov. 10, 2022), at https://sites.ed.gov/idea/files/Letter-to-State-Directors-of-Special-Education-on-Ensuring-a-High-Quality-Education-for-Highly-Mobile-Children-11-10-2022.pdf.

29.     As a remedy for violations under the IDEA, a hearing officer has authority to grant any relief it "determines to be appropriate." 34 C.F.R. § 300.516(c)(3). Compensatory education is an equitable remedy that should "aim to place [children with disabilities] in the same position they would have occupied but for the school district's violation of IDEA." *Reid v. Dist. of Columbia*, 401 F.3d 516, 518 (D.C. Cir 2005).

30.     Any "party aggrieved" by the decision of the hearing officer may seek judicial review by filing a civil action in state or federal court. 20 U.S.C. § 1415(i)(2)(A); *Fry v. Napoleon Cmty. Sch.,* 580 U.S. 154, 159 (2017).

Section 504 Statutory Framework

31.     Section 504 prohibits disability discrimination in federally funded programs. It mandates that "[n]o otherwise qualified individual with a disability in the United States…shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

32.     Section 504 requires that a recipient that operates a school program "conduct an evaluation…of any person who, because of handicap, needs or is believed to need special education or related services." 34 C.F.R. § 104.35(a). The recipient must establish procedures for conducting evaluations that are valid, tailored to specific areas of need, and are selected and administered to ensure accuracy. 34 C.F.R. 104.35(b)(1)-(3). The purpose of the evaluation is to determine which student qualifies for services under Section 504 due to a "physical or mental impairment which substantially limits one or more major life activities." 34 CFR § 104.3(j)(2)(i),(ii).

33.     Students eligible under Section 504 are entitled to a program that will provide a FAPE. 34 C.F.R. § 104.33(a). Under Section 504, a FAPE may include "the provision of regular or special education and related aids and services that [] are designed to meet individual educational needs" of the individual with the disability." 34 C.F.R. § 104.33 (b)(1). This may be accomplished through an IEP developed in accordance with the IDEA's procedures or another written plan developed in accordance with Section 504's procedural regulations. 34 C.F.R. § 104.33 (b)(1)(ii), (2).

34.     The IDEA's exhaustion requirement, 20 U.S.C. § 1415(l), applies to claims brought under Section 504 that seek relief for a denial of a FAPE and relief which is otherwise available under the IDEA. *Fry v. Napoleon Cmty. Sch*., 580 U.S. 154, 168 (2017); *Luna Perez v. Sturgis Pub. Sch.,* 598 U.S. 142, 150, 143 S. Ct. 859, 865, 215 L. Ed. 2d 95 (2023).

35.     Section 504 permits injunctive relief, including compensatory education, and compensatory damages to remedy violations.

EEOA Statutory Framework

36.     The Equal Education Opportunities Act provides that "[n]o State shall deny equal

8

educational opportunity to an individual on account of his or her race, color, sex, or national origin, by…the failure by an educational agency to take appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs." 20 U.S.C. § 1703(f).

37.    National origin discrimination under the EEOA has been found to include but is not limited to, the denial of equal opportunities due to an individual's place of origin; or because an individual has the physical, cultural, or linguistic characteristics of a national origin group, including limited English proficiency. *See, e.g., T.R. v. Sch. Dist. of Phila.*, 223 F. Supp. 3d 321, 334 (E.D. Pa. 2016).

38.    A school district does not satisfy its obligation to take "appropriate action to overcome language barriers" when it fails to: 1) "[pursue] a program informed by an educational theory recognized as sound by some experts in the field or, at least, deemed a legitimate experimental strategy"; 2) "'actually use[]' a program 'reasonably calculated to implement effectively the educational theory adopted by the school'"; or 3) "'produce results' indicating that language barriers are 'actually being overcome'." *Issa v. School Dist. of Lancaster,* 847 F.3d 121, 132 (3d Cir. 2017) (*citing Castaneda v. Pickard*, 648 F.2d 989, 1008 (5th Cir. 1981)).

<u>Title VI Statutory Framework</u>

39.    Title VI of the Civil Rights Act prohibits discrimination within any program or activity receiving federal financial assistance. It states that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

40.    National origin discrimination under Title VI has been found to include but is not

limited to, the denial of equal opportunities due to an individual's place of origin; or because an

individual has the physical, cultural, or linguistic characteristics of a national origin group,

including limited English proficiency. *See, e.g., T.R. v. Sch. Dist. of Phila.*, 223 F. Supp. 3d 321,

334 (E.D. Pa. 2016).

## V.    **FACTUAL BACKGROUND**

41.    Y.C.Q. is a 17-year-old, twelfth-grade student in foster care who attends

Chichester High School in the District.

42.    Y.C.Q. is an English learner who is originally from Guatemala and whose parents

communicated in the country's indigenous language, K'iche', as well as Spanish. Y.C.Q. does

not communicate proficiently in English.

43.    Y.C.Q. has experienced significant academic, communication, and social-

emotional difficulties while attending Chichester High School.

44.    In addition, she has failed to make expected progress for English learners with

similar exposure to English and the general education curriculum.

45.    While she has attended school in the United States since sixth th grade and has

been attending school consistently since September 2022, Y.C.Q. is unable to complete simple

math and reading problems and her IQ scores fall in the "extremely low" range.

### A.    **Y.C.Q.'s Educational Background**

46.    Y.C.Q. experienced great disruption in her early school history. The exact date of

Y.C.Q.'s arrival in the United States from Guatemala is unknown, but she reports that she went

to school through first grade in Guatemala.

47.    Around the age of 10, Y.C.Q. came to the United States and resided with her

father and her uncle.

48.     She attended school briefly in New Jersey in sixth and seventh grades.

49.     While in New Jersey, Y.C.Q.'s school administered the WIDA ACCESS Language Proficiency Test[2] in the spring of 2021. She scored as follows: 3.2 listening, 1.4 speaking, 1.8 reading, 1.2 writing, 2 comprehension, 1.9 oral, 1.5 literacy, and 1.7 overall.

50.     After this time, she began living with her father in Philadelphia where she had sporadic school participation.

51.     While living with her father, Y.C.Q. was subject to physical abuse by her uncle and her father, including when her father broke her arm for which she received emergency care in the hospital.

52.     Due to the ongoing abuse, Y.C.Q. was taken into custody by Philadelphia County's Department of Human Services ("DHS") at the age of 14.

53.     Prior to entering ninth grade in the summer of 2022, Y.C.Q. was placed in a group home located in North Wales, PA in the Wissahickon School District.

54.     The Family Court of Philadelphia County appointed CASA as her EDM on August 17, 2022. CASA designated Renee Platz to serve as the EDM.

55.     In September 2022, the Family Court ordered Y.C.Q. to be evaluated by Dr. Noa Glick, Psy.D., who diagnosed her with Unspecified Trauma and Stressor Related Disorder and Unspecified Depressive Disorder.

56.     Dr. Glick's evaluation reported that Y.C.Q. identified struggles with depression since the age of 12 and feelings of hopelessness. She reported significant trauma, including psychological and physical abuse from her father and uncle. She reported feeling isolated from

---

[2] Schools administer the WIDA ACCESS Language Proficiency Test to monitor student progress in English language proficiency. The scores range from 1 to 6, with 1 being the lowest. *Interpretive Guide for Score Reports*, WIDA, Spring 2025, at https://wida.wisc.edu/sites/default/files/resource/Interpretive-Guide.pdf.

her family.

57.    As a result of Dr. Glick's evaluation and due to documented symptoms of anxiety, depression, and post-traumatic stress, Y.C.Q. began weekly outpatient therapy from La Puerta Abierta.

**B.    Y.C.Q.'s Initial Entry to High School in Pennsylvania**

58.    Y.C.Q. was enrolled in the Wissahickon School District ("Wissahickon") in September 2022 and began attending high school.

59.    Due to her significant English language needs, Wissahickon placed Y.C.Q. in classes designed for English learners for three periods each day.

60.    Based on continued global difficulties in school, including Y.C.Q.'s failure to make progress in learning English, Y.C.Q.'s EDM requested that she be evaluated to determine her eligibility for special education. Wissahickon completed the evaluation in February 2023.

61.    The Wissahickon evaluation revealed dramatic deficits in Y.C.Q.'s skills and achievement, both in English and Spanish, including cognitive, achievement, communication, and social-emotional. Her academic skills in Spanish were staggeringly low: below the kindergarten level for math calculations and the second to fourth grade level in reading.

62.    Y.C.Q. could read nothing in English and teachers could not tell if she understood them at all when they spoke in English.

63.    Her scores in language proficiency on the Cognitive-Academic Language Proficiency ("CALP") were rated as "limited," "very limited," and "extremely limited," with the evaluator noting her proficiency in her dominant language of Spanish were all very low.

64.    The Wissahickon evaluation documented profound trauma that had occurred to Y.C.Q., which she identified was impacting her ability to participate in school.

65.    However, the Wissahickon evaluation concluded that it could not rule out Y.C.Q.'s lack of exposure to reading and math instruction, as well as her lack of English language skills, as the basis for her academic struggles and therefore on this basis found her ineligible for special education.

66.    Y.C.Q.'s EDM disagreed that the Wissahickon evaluation contained valid reasoning to deny her eligibility for special education services.

67.    The Wissahickon evaluation report itself identified that its assessments were not reliable estimates of her "true potential," yet additional assessments were not recommended and did not occur.

68.    In denying that Y.C.Q. met criteria for a disability, the Wissahickon evaluation relied on narrow criteria and broad exclusions without data to support them.

69.    Finally, the evaluation did not include input from Y.C.Q.'s counselor or child welfare team, including the evaluation conducted by Dr. Glick.

70.    Without an IEP, Y.C.Q. continued to have difficulty at Wissahickon High School while attempting to complete the ninth-grade curriculum.

**C.    Y.C.Q.'s Enrollment and Difficulties in Chichester School District**

71.    On March 31, 2023, Y.C.Q. moved to a new foster home in Chichester, PA in the District, where she continues to live.

72.    When Y.C.Q. entered the District, the District administered a WIDA screener to briefly assess her English language proficiency, on which she scored a 1.5, which was the lowest score.

73.    The District placed Y.C.Q. in English Language Development ("ELD") classes for two periods a day when she first enrolled to complete ninth grade. For all other subjects,

Y.C.Q. was in classes taught solely in English where there was no co-teaching or push-in of English as a Second Language instruction or support.

74.     Upon information and belief, these classes were not designed for students like Y.C.Q. with limited or interrupted formal education ("SLIFE").

75.     When Y.C.Q. entered the District, the District administered a WIDA screener to briefly assess her English language proficiency, on which she scored a 1.5, which was the lowest score.

76.     Y.C.Q. continued to have grave difficulties learning and making progress in school and, on May 31, 2023, her EDM requested another evaluation due to her disagreement with the evaluation that was conducted by Wissahickon.

77.     The District reviewed the Wissahickon evaluation and denied the EDM's request for an evaluation on June 5, 2023. The District issued a NOREP that stated: "Given the current situation, it was recommended and agreed upon that the Chichester School District will work collaboratively with Y.C.Q.'s classroom teachers, English Language Learner ("ELL") teacher, and her educational decision makers to provide interventions to the extent possible in the regular education environment and to monitor whether or not she is able to demonstrate academic growth."

78.     In addition, the District did not identify or evaluate Y.C.Q. to determine her eligibility as an individual with a disability under Section 504.

79.     Y.C.Q. did not receive special education or related services, including services and accommodations under Section 504, at any time during her ninth-grade year in Wissahickon or the District.

80.     Although Y.C.Q. continued to make no progress in learning English, the District

did not provide any ELD instruction to her at the beginning of the 2023-2024 school year when she was in tenth grade due to the lack of a teacher.

81.    Once the District hired a part-time ELD teacher, it placed Y.C.Q. in one ELD class per day beginning on or about October 9, 2023. This class had approximately eight English learner students in it.

82.    Y.C.Q. often complained about school to her EDM and expressed a great deal of anxiety related to school. Y.C.Q. also expressed that she felt she was doing the same thing repeatedly in her ELD class, including looking up definitions in a dictionary, and she felt they did not spend any time conversing in English and that she was not learning.

83.    As a result of continued concerns regarding Y.C.Q.'s failure to make progress during her tenth-grade year, her EDM requested an evaluation again on September 20, 2023. Despite multiple emails and phone calls requesting a response, the District did not respond to the request until November 21, 2023. At that time, the District agreed to conduct the evaluation due to "Y.C.Q.'s continued difficulty in the educational setting and the discussion/implementation of a variety of intervention strategies to support Y.C.Q.'s ability to access her educational program." The EDM promptly signed the Permission to Evaluate.

84.    The District provided the evaluation report to the EDM seventy-two days after she signed the permission to evaluate form and convened a meeting to discuss the evaluation on February 5, 2024.

85.    In the evaluation report, Y.C.Q.'s teachers noted her grave academic, communication, and social difficulties in their classes during the 2023-2024 school year.

86.    Y.C.Q.'s teachers also noted her differences from her English learner peers. For example, one of Y.C.Q.'s teachers noted: "[Y.C.Q.'s] ideas and thoughts are well below grade

level and not as defined as her [English Learner] peers." Another teacher noted that Y.C.Q. struggles with reading – even in Spanish – and struggles with doing any work independently. Her English teacher remarked, while many of her students need accommodations, "Y.C.Q.'s level of intervention is by far the highest."

87.     Y.C.Q.'s English teacher for the 2023-2024 school year, Ms. Shauna Johnson, noted that Y.C.Q. struggles to compose sentences in Spanish, she is not able to write multi-sentence paragraphs in Spanish, and that she did not provide any texts to her in English. Ms. Johnson would scaffold all of Y.C.Q.'s assignments to a lower reading level and described writing assignments as "extremely truncated," usually 1-2 sentences in English or 2-3 if in Spanish.

88.     Y.C.Q.'s teachers also noted that they would try to explain material to her using Microsoft Word to translate, with Ms. Johnson commenting that Y.C.Q. would have trouble using the translate feature.

89.     Teachers also noted that Y.C.Q. was sad more often than her peers.

90.     Even after more than a year and a half of consistent schooling, Y.C.Q. was described as being at the "infant" level of English by her ELD teacher, Mr. James Starkey, in February 2024. Mr. Carlos Carmona, the school psychologist that evaluated Y.C.Q., wrote in the Evaluation Report, "No matter how much she focuses, her brain is against her. In part, she attributes this to the effects that her experienced trauma has on her ability to focus."

91.     While Y.C.Q. received passing grades in her classes, her teachers noted that her grades were more a reflection of her effort, because she could not perform the academic tasks required in ninth and tenth-grade classes.

92.     The evaluation conducted of Y.C.Q. by the District had similar failures to the

previous evaluation by Wissahickon School District.

93.    First, the evaluation assessed Y.C.Q.'s cognitive skills using language heavy assessments and did not include a nonverbal assessment, despite Y.C.Q.'s difficulties with both English and Spanish.

94.    The District used the Wechsler Intelligence Scale for Children – Fifth Edition Spanish and found that Y.C.Q.'s Full Scale IQ was 59 and her composite Nonverbal score was 67, her General Ability score was 66, and her Cognitive Proficiency score was 60. Y.C.Q.'s performance on this assessment was consistent with her performance during the previous year when assessed by Wissahickon.

95.    The District also assessed Y.C.Q.'s achievement using the Batería IV Woodcock-Munoz, an assessment normed for Spanish speakers. Y.C.Q. performed below the 1st percentile in all areas and performed below the .1 percentile in Broad Reading, Broad Mathematics, Math Calculations Skills, Academic Fluency, and Applied Academics.

96.    The District's assessment notes that Y.C.Q.'s "reading skills [in Spanish] are comparable to a first-grade level" and "[s]he could do one-digit addition problem but not subtraction." She has "weak language skills in both Spanish and English" and "[c]ompared to same-age peers exposed to English for 20% of their lives (English Learner norms), Y.C.Q.'s ability to recognize spoken English words is extremely low."

97.    Y.C.Q.'s score on the Ortiz Picture Vocabulary Acquisition test completed during Chichester's 2024 evaluation, which compared Y.C.Q.'s acquisition of vocabulary and English relative to other English learners was 71, in the 3rd percentile compared to her peers.

98.    Teachers generally reported to the District's school psychologist that Y.C.Q. needed intensive help for English language development, that she was struggling in most of her

classes and did not understand English or the curriculum.

99. Mr. Mike Fortuna, Y.C.Q.'s biology teacher noted, "I cannot accurately assess the student's ability to access biology curricular materials due to the fact that the student has extremely limited English proficiency."

100. In addition, the District's evaluation of Y.C.Q.'s social-emotional functioning was gravely insufficient given her vast history of trauma. It did not include any review of Y.C.Q.'s mental health records or input from Y.C.Q.'s counselor from which she receives weekly therapy.

101. The evaluation did include just one assessment for social-emotional functioning, the Behavior Assessment System for Children Third Edition ("BASC"), which revealed clinically significant areas of concerns for all raters except Y.C.Q.'s foster parent.

102. Y.C.Q.'s teachers rated her as clinically significant for Withdrawal, Atypicality, and Social Skills. They rated her as At-Risk for Depression, Attention Problems, Learning Problems, Adaptability, Functional Communication, Leadership, and Study Skills.

103. Y.C.Q. rated herself as clinically significant for Test Anxiety and Self-Reliance, and At-Risk for Attitude to Teachers, Anxiety, Depression, Self-Esteem, and Mania. Y.C.Q.'s foster parent was the only reporter who rated all of Y.C.Q.'s skills as typical in all areas.

104. Despite these concerns, which echoed concerns raised by teachers and Y.C.Q., and which were also noted in Y.C.Q.'s prior evaluation completed at Wissahickon, the District's evaluation included no further assessment of Y.C.Q.'s social-emotional functioning. The District used the foster parent's failure to note any concerns as a basis to dismiss a finding of disability despite the other ratings of Clinically Significant social-emotional skills. The District did not follow up with the foster parent to try to gain a more in depth understanding of this discrepancy.

105. Finally, the District's evaluation included just one assessment of Y.C.Q.'s

18

adaptive skills, the Adaptive Behavior Assessment System Third Edition ("ABAS"), which was completed by just one reporter, Y.C.Q.'s foster parent.

106.    The District attempted for Y.C.Q.'s teachers to complete the ABAS, but reported that the teachers did not know her well enough and had too many guesses. Their scores were not reported.

107.    Given the discrepancies between Y.C.Q.'s foster parent's assessment of Y.C.Q.'s skills on the BASC, the reliance on her foster parent as the sole reporter of Y.C.Q.'s adaptive skills warranted additional assessments. However, the District conducted no other assessments of Y.C.Q.'s adaptive skills. They did not follow-up with the foster parent, ask the EDM for additional input, or request information from Y.C.Q.'s therapist or review medical records. The District used the foster parent's ABAS report to dismiss a finding of disability based on Y.C.Q.'s low cognitive performance.

108.    On February 5, 2024, a team of people, including the EDM and other court-appointed individuals, met to review Y.C.Q.'s evaluation.

109.    Mr. Carmona, the District's school psychologist, shared that Y.C.Q.'s direct assessments, both cognitive and achievement administered in Spanish, revealed performance in the lowest ranges possible. These assessments were consistent with feedback provided by her teachers that Y.C.Q. needs more intensive academic supports to address her extremely limited academic skills.

110.    Despite not finding her eligible for special education, Mr. Carmona noted in his evaluation that Y.C.Q. was in need of intensive English language curriculum for beginners, and suggested the school consider creative ways to expose her to English Language development, such as an extra period of ESL and online access to language programs for school and home.

111.    During the evaluation meeting the EDM had several questions for Mr. Carmona regarding the inconsistencies in Y.C.Q.'s assessment results and the conclusion that she was not eligible for special education and related services. However, due to his limited availability, the meeting was cut short. Although the District originally stated at the abrupt conclusion of the meeting that it would be reconvened so that the EDM could ask her questions, it did not respond to her requests to reconvene.

112.    During the evaluation meeting, the EDM requested that Y.C.Q. receive additional ELD instruction. The District responded that the only additional ELD class offered at the high school was too advanced for Y.C.Q. to benefit based on her beginner language skills.

113.    Following the meeting, upon the EDM's additional request for increased ELD instruction for Y.C.Q., the District responded that Y.C.Q. "is enrolled in all of the classes that put her on the path of graduation and does not have extra space for further ESL."

114.    After the evaluation was completed, in the Spring 2024, the District administered the WIDA ACCESS English Language Proficiency Test, which Y.C.Q. previously completed when she was a student in New Jersey. Y.C.Q.'s scores all remained at Level 1: listening 1.8, speaking 1.4, reading 1.8, writing 1.8, oral language 1.6, literacy 1.8, comprehension 1.8, and overall 1.7. This indicated little to no improvement in all domains from when she completed the test in 2021. In fact, her scores declined in a few categories (*e.g.,* listening score declined from 3.2 to 1. 8 and comprehension declined from 2 to 1.8).

115.    Y.C.Q. did not receive special education or related services, including services or accommodations under Section 504, at any time during her tenth-grade year.

**D.    Due Process Hearing Regarding Request for IEE**

116.    As a result of continued disagreement with the District's evaluation of Y.C.Q., the

EDM requested an Independent Educational Evaluation ("IEE") from the District on April 5, 2024. The District responded by denying the IEE request and filing its first due process complaint on April 30, 2024.

117.    ODR assigned Hearing Officer Cathy Skidmore to the matter.

118.    The one-day hearing was scheduled to commence on June 13, 2024.

119.    During a conference call jointly requested by the parties on June 6, the District requested a briefing schedule for its intended Motion to Preclude the Parent's Expert Witness. The parties complied with the briefing schedule agreed to during the call and Hearing Officer Skidmore issued a ruling denying the District's Motion on June 12, 2024 and permitting the parent's witness to testify.

120.    Just minutes before the hearing was set to begin on June 13, the District withdrew its due process hearing complaint specifically citing Hearing Officer Skidmore's ruling against it as the justification. The EDM opposed this tactical gamesmanship that denied it the opportunity for a timely resolution of its IEE request. However, Hearing Officer Skidmore issued the order dismissing the complaint as requested. In the order, Hearing Officer Skidmore stated: "Should there be a refiling in this case, this hearing officer intends to reassert jurisdiction and, with familiarity with the posture, seek to have any procedural disputes resolved in a fair manner with the benefit of time."

121.    On June 21, 2024, the District submitted a second Due Process Complaint and requested that the matter be reassigned from Hearing Officer Skidmore in order to "eliminat[e] any concern for any appearance of bias." The EDM opposed the request via email on June 21, 2024. ODR appointed Hearing Officer Skidmore to preside over the hearing.

122.    Hearing Officer Skidmore denied the District's recusal request and the new

hearing date was set for July 22, 2024.

123. On July 1, 2024, the EDM submitted its Response to the Due Process Complaint and filed a Counterclaim to request a due process hearing on the District's denial of Y.C.Q.'s right to a FAPE and discrimination based on her disability.

124. The District then went on to request several continuances, first on July 15, 2024 because its school psychologist was in Puerto Rico, and later due to evidentiary rulings.

125. Due to repeated delays with the hearing, the EDM sought the services of Dr. Steven P. Kachmar to initiate an IEE in July 2024.

126. Dr. Kachmar is a licensed school psychologist with nearly twenty years of experience who has worked in several school districts and conducted IEEs at the request of parents and school districts. He has provided training to psychologists and other stakeholders regarding appropriate evaluation practices, including for English learners.

127. In July, Dr. Kachmar reviewed the District's evaluation, as well as Y.C.Q.'s educational and medical records available to the EDM and issued a brief report regarding the concerns identified with the District's evaluation.

128. The hearing regarding the IEE was rescheduled for August 2, 2024, and the District subsequently requested another continuance after receiving the EDM's disclosures, again objecting to evidence the EDM intended to present and demanding to see a complete copy of Y.C.Q.'s child welfare records, despite confidentiality issues.

129. Among the EDM's disclosures to the District was the 2022 Dr. Glick evaluation diagnosing Y.C.Q. with Unspecified Trauma and Stressor Related Disorder and Unspecified Depressive Disorder and a July 22, 2024 letter from La Puerta Abierta, Y.C.Q.'s counselor.

130. The La Puerta Abierta letter indicated that Y.C.Q. repeatedly named school as a

stressor and reported high levels of anxiety and stress related to learning challenges at school. The letter notes that Y.C.Q. "feels overwhelmed by the demands placed on her at school and believes she needs more support" and that she "has been struggling to feel value and worth in the work that she is doing" which has "impacted her self-image." Her therapist emphasized in the letter that these challenges cannot adequately be addressed through therapy.

131.    Due to the request from the District to brief the matter, a briefing schedule was issued and testimony for the IEE hearing did not proceed until October 7, 30, and 31, 2024—four months after the original hearing date. The hearing officer heard testimony from 5 witnesses: Carlos Carmona, the District's school psychologist; Dr. Katharine D'Amora, a school psychologist with Philadelphia's Department of Human Services; Dr. Steven Kachmar, an independent school psychologist; Renee Platz, Y.C.Q.'s EDM and a supervisor at CASA; and Cynthia Santiago, Y.C.Q.'s EDM and a volunteer with CASA.

132.    On December 9, 2024, the hearing officer issued an Order directing the District to fund an IEE for Y.C.Q. because the District's evaluation "failed to comply with all IDEA requirements because it was not sufficiently comprehensive to identify all of [Y.C.Q.]'s relevant needs."

133.    The Order outlines a process for the District to fund an IEE for Y.C.Q. due to the District's failure to conduct an appropriate initial evaluation of her. In addition, the Order acknowledges that the EDM already had an evaluation underway and the EDM may seek to obtain funding for this evaluation under the terms of the Order. Specifically, Paragraph 3 of the Order permits the EDM to elect to request public funding for Dr. Kachmar's evaluation "if the psychologist currently conducting the IEE meets District criteria."

134.    Following the ruling, on December 12, 2024, the District emailed the hearing

23

officer to request more time to present a list of potential evaluators to conduct an additional IEE for Y.C.Q.

135.    On that same day the EDM responded and asked the Hearing Officer to deny this request, because the EDM was seeking to have Dr. Kachmar's IEE reimbursed.

136.    On December 13, 2024, Hearing Officer Skidmore advised that she had relinquished jurisdiction in the matter and therefore did not have the authority to grant the District's request.

137.    On December 18, 2024, counsel for the EDM reiterated to the District that the EDM was electing to obtain funding for Dr. Kachmar's evaluation within the timeline directed by the Order. The EDM provided invoices for Dr. Kachmar's evaluation, including invoices for interpretation.

138.    On December 23, 2024, Dr. Kachmar completed his IEE, which was provided to the District. Dr. Kachmar's comprehensive evaluation included cognitive, achievement, social-emotional, and adaptive assessments, classroom observations, teacher feedback, caregiver feedback, tutor feedback, and counselor input. The IEE found Y.C.Q. eligible for special education under the categories of emotional disturbance and specific learning disability in math calculation. In addition, the IEE issued several recommendations for Y.C.Q.'s appropriate educational programming, including the creation of an IEP.

139.    In his evaluation report, Dr. Kachmar noted a lot of the same concerns previously identified by Y.C.Q.'s EDM, foster parent, teachers, evaluators, and medical providers.

140.    Y.C.Q.'s teachers again reported their concerns about Y.C.Q.'s lack of understanding of English to Dr. Kachmar, with Y.C.Q.'s science teacher advising she needs to practice English, her math teacher reporting concerns about her limited understanding of English,

and her English teacher stating that language is a major barrier, and that he translates texts for her and modifies activities and quizzes.

141.    On January 15, 2025, the District convened a meeting to discuss Dr. Kachmar's IEE, which included the EDM, the District's school psychologist, one of Y.C.Q.'s teachers, a school counselor, and the District's Director of Pupil Services. The District rejected Dr. Kachmar's conclusions that Y.C.Q. was a student with a disability eligible under the IDEA.

142.    The District rejected the EDM's request to fund Dr. Kachmar's IEE based on Dr. Kachmar's appearance as a witness in the IEE hearing and notified the EDM on January 7, 2025 that it will be proceeding with its own evaluation.

143.    In light of the District's refusal to comply with the order, the EDM contacted the Pennsylvania Department of Education ("PDE") on January 8, 2025, asking that they enforce the order. PDE replied on January 13, 2025, advising that they could not enforce the order until May 8, 2025, and to reach back out after that date if there was still a compliance issue.

144.    On February 19, 2025, the EDM learned from Y.C.Q. that the District had unilaterally begun its own evaluation, despite not having requested permission from the EDM, issuing a Permission to Re-evaluate form, or providing any notice to counsel.

145.    The EDM objected, and asked Hearing Officer Skidmore again to clarify her order. The Hearing Officer reiterated that she had no jurisdiction over the matter and could not enforce her own decision but agreed to clarify the intent behind her order.

146.    On March 14, 2025, the hearing officer sent a "Memorandum on Clarification Sought," advising that the District did not cite to any "specific element in its policy that the private evaluator [Dr. Kachmar] failed to meet" in its reasoning for declining to fund Dr. Kachmar's evaluation, and noting that she "did not intend to permit the District to conduct any

evaluation or proceed in any manner where the consent of the Guardians must ordinarily be obtained." She noted again in her memorandum that she has no authority to enforce her decision and issued the notice purely for clarification purposes.

147.    In light of this, on March 18, 2025, the EDM again requested that the District fund Dr. Kachmar's evaluation, and the District again refused. The District's refusal to consider the IEE and provide special education services has continued to this moment.

148.    On April 9, 2025, 121 days after the hearing officer's decision, the District notified the EDM through email that it filed a Motion seeking leave to file an untimely appeal.

149.    Following briefing, the motion for leave to file an appeal was denied, dismissing the matter.

150.    The District has continued to refuse to fund the IEE.

151.    The District has also refused to move forward with developing an IEP and has not provided any special education classes or related services to Y.C.Q.

152.    The District continued to provide just one class per day of English Language Development, with approximately 9 students in the class, and no special education classes.

**E.    Denial of Section 504 Eligibility**

153.    During the remainder of the 2024-2025 school year, Y.C.Q. continued to have significant difficulties in all academic areas and experienced increased anxiety regarding her lack of progress.

154.    The District has refused to provide any special education services or support.

155.    The District continued to provide just one class per day of English Language Development, with approximately 9 students in the class, and no special education classes.

156.    Due to the EDM's ongoing concerns regarding Y.C.Q.'s lack of progress and

continued struggles at school, the EDM separately made a request for a 504 Plan beginning on October 11, 2024.

157.    In support of its request, the EDM provided the District with multiple documents, including the 2022 Dr. Noa Glick evaluation, Wissahickon's Evaluation Report, Chichester's Evaluation Report, and the July 2024 La Puerta Abierta letter.

158.    The District requested additional information and documentation from the EDM to support the request for the Section 504 evaluation, which was provided on October 21, 2024.

159.    The District issued a 504 Evaluation Report on December 5, 2024, 55 days after the initial request.

160.    Despite its receipt of numerous documents, including the 2022 Dr. Noa Glick evaluation, Wissahickon's Evaluation Report, Chichester's Evaluation Report, a 504 referral form, IXL scores, grade reports, and the July 2024 La Puerta Abierta letter, the District's December 2024 evaluation concluded that "the determination of the need for a 504 cannot be made at this time."

161.    The District never made a final determination and never provided a 504 Plan.

**F.    Due Process Hearing Regarding Denials of FAPE Under IDEA and Section 504**

162.    A second hearing, ODR No. 29972-2425KE, proceeded on January 22, 23, February 21, March 12, 13, and 20, to resolve the issues presented in the E.D.M's "Counterclaim" filed on July 1, 2024 involving the District's continued denial of Y.C.Q.'s right to a FAPE under the IDEA and Section 504 by: (1) failing to locate, identify, and evaluate Y.C.Q. to determine her eligibility for special education and related services; (2) failing to timely respond to the EDM's request for an evaluation; (3) failing to timely and appropriately evaluate her in all areas of need; and (4) failing to appropriately determine her eligibility for special

education and related services.

163.    During this second hearing, the hearing officer heard testimony from 12 witnesses: Dr. Steven Kachmar, independent school psychologist who served as an expert; Christopher Beyer, math teacher; Patsy Graber, academic tutor; Shauna Johnson, English teacher; James Starkey, ELD teacher; Elizabeth Adams, math teacher; Allison Ricco, school psychologist; Cynthia Santiago, EDM volunteer; Narcissa Burgos, foster parent; Nicole Athey, school counselor; Kayla Higgins, Spanish teacher; and Cesar Ibarra, interpreter.

164.    Y.C.Q.'s teachers, her EDM, and her tutor provided additional testimony and insight about Y.C.Q.'s continued struggles at school academically, emotionally, and her struggles with language.

165.    Despite test scores and repeated discussions by teachers about a need for intensive English Language Development, Y.C.Q.'s teachers reported very little in the way of support from Mr. Starkey, the ELD teacher, which they noted included a few discussions with him about how to interact with English learner students and how to support them.

166.    Although Mr. Starkey could not recall specific strategies about how to support Y.C.Q. that he relayed to teachers, he did recall that he would provide his opinion about whether Y.C.Q. could complete assignments.

167.    Ms. Johnson, Y.C.Q.'s English teacher, noted that no one from the District advised her about Y.C.Q.'s level of Spanish comprehension.

168.    On April 14, 2025, the hearing officer issued a decision finding that the District violated Y.C.Q.'s right to a FAPE and ordered them to provide Y.C.Q. with an IEP.

169.    The Decision concludes that "the evidence is more than preponderant that the District had knowledge at the time it reviewed the IEE that Student met eligibility criteria for

Emotional Disturbance, and that an IEP was necessary under the law."

170.    The hearing officer noted that the District's January 2024 evaluation was not comprehensive but determined that the violation of Y.C.Q.'s right to a FAPE occurred on February 28, 2025 and that her entitlement to compensatory education services commenced on March 3, 2025. This date was apparently selected as a "reasonable time" after the IEE was shared with the District in December 2024 and a meeting to discuss the IEE took place in January 2025.

171.    The Decision notes that the District did not have "critical information about the student," at the time of its evaluation. The hearing officer failed to note that the record showed that the District had this report in July 2024 but made no efforts to reconsider its previous evaluation or conduct a new one.

172.    The hearing officer also found that Dr. Kachmar's IEE comprehensively assessed all areas of Y.C.Q.'s suspected disabilities.

173.    The hearing officer concluded that the District did not violate its child find obligation until after the IEE was completed and the District had a "reasonable period of time to consider and respond to its conclusions."

174.    As part of the rationale, the hearing officer noted that there was "indication of a need to examine emotional presentation," but that information was not gathered by the District by the spring of 2024.

175.    The hearing officer failed to consider that the District was on notice of the student's emotional concerns as reported by the EDM, and reflected in numerous medical documents confirming diagnoses and through concerns shared with school since at least the summer of 2024, and that the District was in receipt of Dr. Glick's evaluation as of July 2024

and was aware the student was in therapy at the time of the District's evaluation.

176.    In her decision, the hearing officer found the student qualified for special education under the category of Emotional Disturbance.

177.    The hearing officer found that the student did not qualify for special education under a specific learning disability in math calculation. In making this decision, the hearing officer found that despite Dr. Kachmar's determination, Y.C.Q. had not been exposed to instruction in basic mathematics skills since being enrolled in the District, and therefore could not be eligible.

178.    The hearing officer further found that the District was required to consider the IEE in a meaningful way when determining Y.C.Q.'s eligibility, and that they did not do so.

179.    The hearing officer found the District's procedural violations, such as the District's failure to conduct a timely evaluation under Section 504 and the IDEA, to be "de minimis."

180.    As a remedy, the hearing officer ordered the District to convene an IEP meeting and develop an IEP under emotional disturbance, with related services including counseling, as well as basic foundational mathematics instruction.

181.    The hearing officer ordered compensatory education in the form of five hours per week beginning March 3, 2025. It is unclear how that specific date was determined.

182.    On April 22, 2025, counsel for the EDM contacted the District to request dates for an IEP meeting to implement the Decision and Order.

183.    The District has not scheduled a meeting, and Y.C.Q. continues to be without special education and related services.

184.    The District has not taken any steps to comply with the Decision and Order.

185.    Y.C.Q. did not receive special education or related services, including services or accommodations under Section 504, at any time during her eleventh-grade year.

## VI.    HEARING OFFICER'S ERRORS

### A.    The Hearing Officer Improperly Assessed Plaintiff's Child Find Violation under the IDEA, Including Entitlement to Compensatory Education Services.

186.    The hearing officer erred as a matter of law by failing to properly determine whether the District violated its child find obligation when it did not properly gather information about and consider Y.C.Q.'s mental health and trauma history or properly assess Y.C.Q.'s social-emotional skills.

187.    The hearing officer erred as a matter of law by failing to consider whether the District's failure to conduct a sufficiently comprehensive evaluation of Y.C.Q. constituted a procedural violation that "impeded the child's right to a FAPE." 34 C.F.R. § 300.513(a)(2)(i).

188.    The hearing officer erred as a matter of law by failing to consider whether the District's failure to conduct a sufficiently comprehensive evaluation of Y.C.Q. constituted a procedural violation that "[s]ignificantly impeded the parent's opportunity to participate in the decision-making process regarding the provisions of a FAPE" to Y.C.Q. 34 C.F.R. § 300.513(a)(2)(ii).

189.    The hearing officer erred as a matter of law by failing to consider whether the District's failure to conduct a sufficiently comprehensive evaluation of Y.C.Q. constituted a procedural violation that "caused a deprivation of educational benefits." 34 C.F.R. § 300.513(a)(2)(iii).

190.    The hearing officer erred as a matter of law by failing to provide any remedy for the District's failure to conduct a sufficiently comprehensive evaluation of Y.C.Q. which constituted a procedural violation that "impeded the child's right to a FAPE." 34 C.F.R. §

300.513(a)(2)(i).

191.    The hearing officer erred as a matter of law by failing to provide any remedy for District's failure to conduct a sufficiently comprehensive evaluation of Y.C.Q., which constituted a procedural violation that "[s]ignificantly impeded the parent's opportunity to participate in the decision-making process regarding the provisions of a FAPE" to Y.C.Q. 34 § C.F.R. 300.513(a)(2)(ii).

192.    The hearing officer erred as a matter of law by failing to provide any remedy for the District's failure to conduct a sufficiently comprehensive evaluation of Y.C.Q., which constituted a procedural violation that "caused a deprivation of educational benefits." 34 C.F.R. § 300.513(a)(2)(iii).

193.    The hearing officer erred as a matter of law and/or abused her discretion by failing to find that Y.C.Q. is a student with a specific learning disability in math calculation.

194.    The hearing officer erred as a matter of law by failing to properly determine the period of violation following her finding that the District violated Y.C.Q.'s right to a FAPE by failing to properly consider Dr. Kachmar's IEE on January 15, 2025.

195.    The hearing officer abused her discretion by failing to provide an appropriate remedy for the District's violations of Y.C.Q.'s right to a FAPE under the IDEA from March 6, 2024 to the present (the period of violation) and awarding only 5 hours of compensatory education services per week from March 3, 2025 to the present.

**B.    The Hearing Officer Improperly Failed to Conduct an Analysis of Claims under Section 504 Separately from IDEA Claims.**

196.    The hearing officer erred as a matter of law by failing to consider documentation known to the District of Y.C.Q.'s disabilities and failing to conduct any analysis to determine whether Y.C.Q. qualifies for services under Section 504 as a student with a "physical or mental

impairment which substantially limits one or more major life activities." 34 CFR § 104.3(j)(1)(i).

197.    The hearing officer erred as a matter of law by failing to conduct a separate analysis to determine whether the District violated the "child find" section of Section 504, which requires that a district evaluate students suspected of having a disability who may be in need of accommodations. 34 C.F.R. § 104.35.

198.    The hearing officer erred as a matter of law by failing to conduct a separate analysis as to whether the District properly evaluated Y.C.Q. under Section 504. 34 C.F.R. § 104.35(b).

199.    The hearing officer erred as a matter of law by failing to conduct any analysis to determine whether the District followed proper evaluation procedures, including proper timelines for evaluations under Pennsylvania's Section 504 implementing regulations. 22 Pa. Code § 15.6(d).

200.    The hearing officer erred as a matter of law by failing to conduct a Section 504 analysis of claims separate from her IDEA analysis of claims.

201.    The hearing officer erred as a matter of law by failing to provide an appropriate remedy, including an appropriate award of compensatory education under Section 504 for the District's failure to identify, evaluate, and serve Y.C.Q. as a student with qualifying disabilities who needed accommodations in school under Section 504.


## VII.    LEGAL CLAIMS

### Count One: Violation of the Individuals with Disabilities Education Act: Failure to Properly Identify, Locate, and Evaluate Y.C.Q. As a Child with a Disability

202.    Plaintiffs incorporate the preceding paragraphs of this Complaint as if set forth in full herein.

203.     Y.C.Q. is a "child with a disability" and Renee Platz, the EDM, is a "parent" eligible for entitlements and protections under the IDEA.

204.     The District failed to comprehensively assess Y.C.Q. in all areas of need, including her social-emotional needs, in accordance with 20 U.S.C. § 1414(b) when it assessed her during the 2023-2024 school year.

205.     The District failed on February 5, 2024 to properly identify Y.C.Q. as a child with a disability consistent with 20 U.S.C. § 1414(b)(4) despite evidence of Y.C.Q.'s significant academic and social-emotional difficulties impacting her in school, as well as her history of trauma, and denied her eligibility.

206.     The District has continued to fail to identify Y.C.Q. as a child with a disability consistent with 20 U.S.C. § 1414(b) from February 5, 2024 to the present despite her significant academic and social-emotional difficulties impacting her in school, multiple mental health diagnoses, her failure to make meaningful progress in three years in high school, and an IEE identifying her as a child with an Emotional Disturbance and Specific Learning Disability.

207.     The District has failed to design an IEP to address her unique needs as a child with a disability in accordance with 20 U.S.C. § 1414(d) from March 6, 2024 to the present.

208.     As a result, Y.C.Q. has not made progress in developing the skills for further education, employment, and independent living necessary for when she exits high school.

209.     These failures constitute procedural violations of the IDEA that impede Y.C.Q.'s right to a FAPE.

210.     These failures significantly impede the EDM's entitlement to participate in Y.C.Q.'s educational decision making and deprive Y.C.Q. of educational benefit. As a result, Y.C.Q. has been denied a free appropriate public education guaranteed to her under the IDEA.

211.    Ms. Platz secured the services of the Education Law Center – PA to represent them on Y.C.Q.'s behalf in a due process hearing and are entitled to reasonable attorney's fees as the prevailing party. As Plaintiff was the prevailing party, the District is responsible for those fees, which can be resolved after the merits of this matter are addressed.

212.    Wherefore, Ms. Platz and Y.C.Q. demand judgment in their favor and against the District for injunctive relief, as set forth herein.

### Count Two: Violation of Section 504 of the Rehabilitation Act of 1973: Failure to Properly Identify and Evaluate Y.C.Q. as an Individual with a Disability

213.    Plaintiffs incorporate the preceding paragraphs of this Complaint as if set forth in full herein.

214.    Y.C.Q. is an individual with a disability who was otherwise qualified to participate in school activities and receive equal benefit from them as non-disabled students pursuant to the protection of Section 504.

215.    The District has been aware of Y.C.Q.'s need for accommodations in order for her to receive equal benefit from the District's educational program since June 5, 2023.

216.    Despite this knowledge, the District has acted intentionally, repeatedly, and with deliberate indifference by failing to properly identify and evaluate Y.C.Q. consistent with the procedures of Section 504.

217.    The District has substantially undermined the ability of Y.C.Q. to receive equal access to education services on the same basis as students without disabilities.

218.    Wherefore, Y.C.Q. demands judgment in her favor and against the District for injunctive relief, as set forth herein.

### Count Three: Violation of the Equal Education Opportunity Act: Failure to Properly Act to Overcome Language Barriers that Impede Equal Participation

35

219.    Plaintiffs incorporate the preceding paragraphs of this Complaint as set forth in full herein.

220.    Federal law provides that: "No State shall deny equal educational opportunity to an individual on account of his or her race, color, sex, or national origin, by…the failure by an educational agency to take appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs." 20 U.S.C. § 1703(f).

221.    National origin discrimination has been defined to include but is not limited to, the denial of equal opportunities due to an individual's, or his or her ancestors', place of origin; or because an individual has the physical, cultural, or linguistic characteristics of a national origin group, including limited English proficiency.

222.    The District is an educational agency under 20 U.S.C. § 1703(f) and 20 U.S.C. § 1720(a).

223.    The District's failure to overcome language barriers includes but is not limited to:

    a.  failing to provide an appropriate amount of ESL instruction based on the individual needs of Plaintiff;

    b.  failing to provide an appropriate and necessary program for Y.C.Q. as a student with limited and interrupted formal education;

    c.  failing to provide modifications and accommodations to content instruction and testing which denied Plaintiffs access to comprehensible instruction and meaningful learning.

224.    Each of these failures has impeded equal participation by Plaintiff in instructional programs of the District and thereby denied Plaintiff an equal education.

225.    The District has denied equal education opportunity to Y.C.Q. on account of her race and/or national origin by failing to take appropriate action to overcome Y.C.Q.'s language barriers.

226. This failure has impeded equal participation by Y.C.Q. in the District's educational program and harmed Y.C.Q.

227. Wherefore, Y.C.Q. demands judgment in her favor and against the District for injunctive relief, as set forth herein.

**Count Four: Violation of Title VI of the Civil Rights Act of 1964:**
**Discrimination on the Basis of National Origin**

228. Plaintiffs incorporate the preceding paragraphs of this Complaint as set forth in full herein.

229. The District has been aware of Y.C.Q.'s need for language accommodations in order to ensure access to the District's educational program since she began as a student in the District.

230. Despite this knowledge, the District has acted intentionally, repeatedly, and with deliberate indifference by reducing and limiting her ELD instruction and refusing to provide appropriate translation and interpretation for Y.C.Q. to access the general education program.

231. Section 601 of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

232. Regulations promulgated pursuant to Section 602 of Title VI forbid the District from utilizing methods of administration that subject individuals to discrimination because of race and/or national origin or that have the effect of defeating or substantially impairing accomplishment of the objectives of the program with respect to individuals of a particular race, color, or national origin.  These regulations, in relevant part, prohibit the following forms of discrimination:

37

(a) A recipient under any program to which this part applies may not, directly or through contractual or other arrangements, on ground of race, color, or national origin deny an individual any service, financial aid, or other benefit provided under the program;

(b) provide any service, financial aid, or other benefit to an individual which is different, or is provided in a different manner, from that provided to others under the program;

(c) subject an individual to segregation or separate treatment in any matter related to his receipt of any service, financial aid, or other benefit under the program;

(d) restrict an individual in any way in the enjoyment of any advantage or privilege enjoyed by others receiving any service, financial aid, or other benefit under the program;

(e) treat an individual differently from others in determining whether he satisfies any admission, enrollment, quota, eligibility, membership or other requirement or condition which individuals must meet in order to be provided any service, financial aid, or other benefit provided under the program;

(f) deny an individual an opportunity to participate in the program through the provision of services or otherwise or afford him an opportunity to do so which is different from that afforded others under the program.

34 C.F.R. §§ 100.3(b)(1)(i)-(vi).

233.    As a recipient of federal funds, the District is prohibited from discriminating against Plaintiff, including by excluding her from instructional services, failing to provide appropriate instruction and language services and by providing unequal educational services on

38

the basis of national origin.

234.    The failure to assist Y.C.Q. to participate effectively in or benefit from federally assisted programs and activities violates Title VI of the Civil Rights Act of 1964 and regulations prohibiting discrimination on the basis of race and national origin. Recipients must take appropriate action to ensure that such persons have meaningful access to the programs, services, and information those recipients provide.

235.    The District failed in its obligation to avoid discrimination against Y.C.Q. on the grounds of race and/or national origin by failing to take reasonable steps to ensure that she had meaningful access to the programs, services, and information that the District provides to others.

236.    Wherefore, Y.C.Q. demands judgment in her favor and against the District for injunctive relief, as set forth herein.

**WHEREFORE**, the EDM respectfully requests this Honorable Court:

1.    Assert jurisdiction over the action;

2.    Receive the administrative record;

3.    Hear and consider additional evidence as appropriate under 20 U.S.C. § 1415(i)(2)(C)(ii);

4.    Declare that Y.C.Q.'s placement at Chichester High School with an IEP developed in accordance with the Hearing Officer's April 14, 2025 Decision and Order is her pendant placement pursuant to 20 U.S.C. § 1415(j) and 34 C.F.R. § 300.518(a);

5.    Issue an order directing the District to enforce Y.C.Q.'s pendant placement;

6.    Reverse the Hearing Officer's Decision and Order and declare that:

   a.    Chichester School District's denied Y.C.Q.'s right to a FAPE under the IDEA from March 6, 2024 to the present; and

   b.    Chichester School District's denied Y.C.Q.'s right to a FAPE under Section

504 from June 5, 2023 to the present.

7.    Order the District to provide declaratory, injunctive, and monetary relief,

including but not limited to:

    a.  Declaring Defendant's actions and inactions in violation of the IDEA, Section 504, the EEOA and Title VI of the Civil Rights Act;

    b.  Enjoining Defendant from violating these applicable federal laws.

    c.  Awarding Y.C.Q. appropriate compensatory education services for deprivation of a FAPE in violation of the IDEA from March 6, 2024 to the present;

    d.  Awarding Y.C.Q. appropriate compensatory education services for deprivation of a FAPE in violation of Section 504 from June 5, 2023 to the present;

    e.  Directing the District to provide effective language instruction services to meet the individual needs of Y.C.Q. as an English Learner by providing Y.C.Q. an appropriate program of language instruction based on a sound educational theory to overcome language barriers, including sufficient ESL instruction, interpretation and translation services, modifications to curriculum and content instruction, accommodations in testing and assessments of the program to evaluate effectiveness;

    f.  Providing Y.C.Q. supplemental educational services to make up for the deprivation of a meaningful education.

    g.  Awarding Y.C.Q. compensatory damages for the Defendant's actions and omissions in violation Section 504, the EEOA, and Title VI of the Civil Rights Act;

8.    Declare that the Plaintiffs are the prevailing party and order the Defendant to pay

Plaintiffs their reasonable attorneys' fees and related costs;

9.    Retain jurisdiction over this matter until such time as Defendant demonstrates full

compliance with applicable federal laws; and

10.    Grant any other relief as this Court deems proper.

Respectfully submitted,

Dated: July 11, 2025          BY:          /s/ *Margaret M. Wakelin*

Margaret M. Wakelin
Attorney ID: 325500
EDUCATION LAW CENTER
1800 John F. Kennedy Blvd.
Philadelphia, PA 19103
(215) 800-0349
mwakelin@elc-pa.org


/s/ *Rebecca A. Preuss*

Rebecca A. Preuss
Attorney ID: 318950
EDUCATION LAW CENTER
1800 John F. Kennedy Blvd.
Philadelphia, PA 19103
(215) 346-6904
rpreuss@elc-pa.org